FILED

03/21/2025

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville March 18, 2025

## STATE OF TENNESSEE v. JERRY IRVE BUCKNER
## a/k/a JERRY IRVIN BUCKNER

**Appeal from the Criminal Court for Davidson County**
**No. 2021-A-359      Jennifer Smith, Judge**

_____

### No. M2023-01504-CCA-R3-CD

_____

The Defendant, Jerry Buckner, was convicted by a Davidson County Criminal Court jury of second degree murder, a Class A felony, and unlawful possession of a firearm by a convicted felon, a Class B felony. *See* T.C.A. §§ 39-13-210 (2018) (second degree murder), 39-17-1307(b)(1)(A) (2018) (subsequently amended) (unlawful firearm possession). The trial court sentenced the Defendant to serve concurrent sentences of forty years for second degree murder and twenty years for the firearm possession. On appeal, he contends that the evidence is insufficient to support his convictions and that the trial court erred in declining to instruct the jury on the defense of self-defense. We affirm the judgments of the trial court and remand for correction of a clerical error on the judgment for the firearm conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed, Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

Jay Umerley (on appeal) and Nathan Cate (at trial), Nashville, Tennessee, for the appellant, Jerry Buckner.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Kristen Stonehill and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions result from the March 31, 2020 shooting death of Thomas Boyd in the parking lot of a Davidson County motel. The victim died from a single gunshot wound. The incident was captured on the motel's surveillance video, which was part of the State's evidence at the trial. Cell phone location data established that a cell phone associated with the Defendant was near the motel at the time of the shooting.

At the trial, a police officer testified that he learned during the investigation that Randall Davis checked into the motel on March 28, 2020. Surveillance video showed that the Defendant and Mr. Davis arrived in a white GMC SUV. Mr. Davis checked into Room 109, and the two occupied the motel room through the time of the incident on March 31.

The video surveillance evidence of the early morning hours of March 31, 2020 included recordings from different angles outside the motel. A detective identified the people shown in the videos as the Defendant, Mr. Davis, and the victim, all of whom were shown outside the two-story motel. In the minutes preceding the shooting, the victim arrived in a red Chrysler van, which parked three parking spots from Room 109. The victim got out, pulled up the hood of his sweatshirt, and walked past Room 109 and an unidentified woman and Mr. Davis, who stood outside the door of Room 109. A flash, consistent with a source such as a lighter, occurred near the victim's face as he walked past the room. The victim walked to the corner of the building and went up the stairs at the end of the building that led to the second floor's exterior walkway. The Defendant came out of Room 109 and stood near its door. He then walked about forty feet along the side of the building and stood at its corner as Mr. Davis went across the parking lot to his blue Chevrolet SUV, which was backed into a parking spot. The Defendant remained at the corner, facing the direction of the stairs that the victim had walked up, while Mr. Davis stood outside the SUV for several seconds. The Defendant and Mr. Davis then walked back to Room 109 and stood outside its door. As these events transpired below, the victim stood on the upstairs exterior walkway, outside a motel room which other evidence showed was Room 208, for about one minute. He knocked several times on the door of Room 208, but no one opened the door. Eventually, the victim walked downstairs and around the corner of the building toward the Defendant, who stood outside the open doorway to Room 109 and faced the corner of the building. The victim walked with his left hand at his side and right hand in his pocket. The victim did not appear to hold anything and did not make any aggressive movement toward the Defendant, who held a gun. When the victim was about fifteen to twenty feet away, the Defendant raised his arms and fired at least three or four shots at the victim. The victim raised his arms to shield himself, turned, and ran between two vans into an area that was obscured on the video. Flashes from the gun's muzzle were visible in the videos. Mr. Davis stood behind the Defendant in the open doorway to Room 109 during the shooting. After the shooting, the Defendant stepped

inside Room 109 and closed the door. Two people got out of the blue Chevrolet SUV in the parking lot, and one ran away. Within seconds, the Defendant, Mr. Davis, and three other people left Room 109. The Defendant got into the driver's seat of the blue Chevrolet SUV. The man who had been in the SUV's driver's seat, but had not run away, got into the front passenger seat. Mr. Davis and the three people who had been in the motel room had moved toward the blue Chevrolet SUV, but the Defendant drove away and left them standing in the parking lot. The Defendant did not check on the victim before leaving. Mr. Davis and two of the other people the Defendant left behind then left the motel in the white GMC SUV, which was parked directly outside Room 109. After the shooting, the victim lay on the motel parking lot beside the red Chrysler van in which he had arrived.

A detective who responded to the scene testified that two women who had been with the victim admitted that they had taken a gun from the victim's person after the shooting and had placed it in a vehicle "because they didn't want the victim to get in trouble for having it." The police did not recover this gun when they searched the vehicle. Another detective testified that the two women who rendered aid to the victim had been sitting in a red Chrysler van in the parking lot at the time of the shooting after having come to the motel with the victim.

The detective who initially responded to the scene acknowledged that he did not obtain information about the person who had checked into Room 208, which was the upstairs room where the victim knocked on the door just before going downstairs and being shot by the Defendant on March 31, 2020. When shown surveillance video of a man and a woman arriving in a black truck and entering Room 208 about eleven hours before the shooting and leaving about forty-five minutes after entering, the detective acknowledged that he had not reviewed the recording or determined the identification of the people shown. The detective acknowledged that he had not obtained any room receipt reflecting that the victim had checked in to any motel room. The detective agreed that he had not been the lead detective and had identified evidence to be collected but had not reviewed it all.

An evidence technician testified that a bullet fragment was recovered from under a white van parked near the corner of the motel building and that the van showed evidence of "having been struck with gunfire." He said the front passenger window was shattered and a "defect" existed under the window. He said no firearms were found in a red Chrysler van that was in the parking lot next to where the victim lay. The evidence technician testified that if a revolver were used in a crime, casings would not be found at a crime scene "unless the casings were dumped and the revolver was reloaded." He said no guns were found at the scene.

The forensic pathologist who performed the victim's autopsy testified that he recovered a projectile from the victim's right chest. In his opinion, the victim's cause of

death was a gunshot wound, which entered the victim's arm and traveled to his chest, severing his aorta. The manner of death was homicide. The medical examiner said the victim was 68″ tall and weighed approximately 228 pounds.

A firearms and tool mark identification expert testified that a fired bullet recovered during the autopsy was consistent with a .38 Special or .357 Magnum caliber bullet and had been fired from a revolver. He said the fired bullet fragment recovered from under the white van was too damaged to determine whether it had been fired from the same gun as the bullet recovered during the autopsy.

The lead detective testified that the Defendant wore black and white shoes in the surveillance videos of the shooting and that he wore "black and white Jordans with some red stitching" and distinctive markings when he was arrested on April 24, 2020. Surveillance videos from March 28, 30, and 31, 2020, were played, and the detective noted the distinctive characteristics of the Defendant's shoes and the color of his clothing in the videos.

The lead detective testified that she received a lighter, which the medical examiner had recovered with the victim's effects. She said the lighter was significant because the victim had lit a cigarette or "[s]omething like a cigarette" as he "walked through" the first floor exterior walkway, as shown on the surveillance recordings. She said that she examined the victim's hooded sweatshirt and that it had a single bullet hole in the arm. She examined the pocket area and found no bullet holes. She said the records from the cell phone associated with the Defendant showed that the cell phone had moved away from the motel area shortly after the shooting. She said the cell phone records for Mr. Davis and the Defendant reflected frequent communications between them, including calls from Mr. Davis to the Defendant shortly after the shooting. She said that, although the police attempted to talk to other occupants of Room 109, one person later became a homicide victim and another person refused to give a statement. She said that her investigation showed no efforts by the Defendant after the shooting to assist the wounded victim or to call 9-1-1 on the victim's behalf. She said that, when she reviewed the surveillance videos, she saw the people who had come to the motel with the victim pick up something "that appears to look like a gun." She said that the police reviewed the surveillance videos and that, if any interaction between the Defendant and the victim occurred before the shooting, the police would have recovered such videos. She acknowledged that, despite having recovered over one hour of videos, the police did not recover videos for the nine hours which preceded the recovered videos. She acknowledged that the victim may have taken a gun out of his sweatshirt pocket after the Defendant fired at him, but she said she did not see this on the recordings. She said the victim appeared to have something in his sweatshirt pocket, which she said could have been his hand, a cell phone, or a handgun. She said that if the victim fired a gun at the Defendant, it occurred after the Defendant had already fired

a shot at the victim. The lead detective acknowledged that she had obtained the names and contact information for the two women who had been with the victim at the motel and that they were not present at the trial.

The parties stipulated that the Defendant was convicted before March 31, 2020, of a felony involving the use or attempted use of force, violence, or a deadly weapon.

The defense elected not to present proof. The trial court declined the Defendant's request for a jury instruction on self-defense, finding that the proof had not fairly raised the issue of self-defense. The court found that the victim did not have a visible gun in the recordings and that no evidence was offered to support a conclusion that the Defendant reasonably believed he was in imminent danger of death or serious bodily injury. *See* T.C.A. § 39-11-611(b)(2) (2018) (subsequently amended). The jury found the Defendant guilty of second degree murder as a lesser included offense of first degree murder and of unlawful possession of a firearm by a convicted felon. After the court imposed an effective forty-year sentence, this appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Likewise, he has challenged the trial court's decision not to give his requested self-defense instruction. Because these issues are intertwined, we will consider them in tandem.

The Defendant argues that the evidence showed he acted in self-defense and that the trial court erred in declining to instruct the jury on the affirmative defense of self-defense. At the time of the offense, the self-defense statute provided, in pertinent part:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> >
> > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> >
> > (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2018) (subsequently amended).

Our supreme court has concluded that sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.*; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993).

When presented with the question of whether the evidence fairly raised the affirmative defense of self-defense, the trial court's findings included the following:

> The entirety of the proof in this case -- and there was -- you know, there was a lot of testimony about the video. But the entirety of the State's proof in this case is effectively a video that captures the shooting of the victim.

> There was testimony about, you know, various -- what various witnesses perceived and what it looked like was happening. But the bottom line is that the evidence itself is the video. And the Court had the opportunity to view the video many, many times today along with the jury. And the video showed the victim arriving at the hotel, the victim, you know, very calmly exiting a vehicle, lighting a cigarette or a cigar or whatever, walking past . . . Room 108 where the defendant was located and the number of other people. There was no – there was nothing out of the ordinary in the victim's demeanor. There was no threatening gesture at any point. The video showed the victim walk up to 208, stand there for a little while, knock on the door, didn't get an answer, and return the same way he came.

> When he came back down, the video clearly showed him again walking. There is nothing threatening about the victim's demeanor as he is walking toward the defendant who in contrast is obviously armed. He has a weapon that is visible on the video. The video clearly shows the defendant raise his weapon and point his weapon at the victim before there is really any movement by the victim at all. So that in and of itself I think would negate any claim of self defense in this instance.

> There is no – there is no proof whatsoever that the victim ever raised a weapon at the defendant or that the defendant perceived that a weapon was aim[ed] at him.

There is not a weapon seen on the video. There is no indication from the video of any threatening gesture before the defendant is pointing his firearm directly at the victim.

There is no proof that the defendant honestly believed that he was in fear of imminent bodily harm before he pointed his weapon at the victim and fired at the victim.

Having found that the evidence, viewed in the light most favorable to the Defendant, did not fairly raise self-defense, the court declined the Defendant's request for the self-defense jury instruction.

We consider, first, the question of whether the instruction should have been given. The law provides that a criminal defendant has "a right to a correct and complete charge of the law." *State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *Hawkins*, 406 S.W.3d at 129 (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general defenses, including self-defense, is not required to be submitted to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c) (2018). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to appropriate instructions." *Johnson*, 531 S.W.2d at 559. Because a decision regarding the grant or denial of jury instructions involves a mixed question of law and fact, our review is de novo with no presumption of correctness. *State v. Benson*, 600 S.W.3d 896, 902 (Tenn. 2020).

When the evidence presented at the trial fairly raises a general defense, the trial court is required to provide the jury with the appropriate instruction. *Hawkins*, 406 S.W.3d at 129. A jury instruction, though, is "prejudicially erroneous only if the . . . charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

Viewing the evidence in the light most favorable to the Defendant, the trial court found that self-defense had not been fairly raised. Having again reviewed the evidence in the same light, we conclude that it supports the court's determination. Despite the evidence that the victim possessed a gun on the evening of his death, the surveillance recordings are

notable in their absence of his displaying a gun or engaging in any behavior which the Defendant might have reasonably believed to have placed him in imminent danger of death or serious bodily injury.

The Defendant's argument highlights the difference between a theory and proof when analyzing whether a self-defense jury instruction should be given. The Defendant advanced a theory, but no proof supported it. Had a modicum of proof existed to fairly raise the question of the existence of the defense, the trial court would have been required to give the requested instruction. *See Johnson*, 531 S.W.2d at 559. The court did not err in declining to give the requested instruction. The Defendant is not entitled to relief on this basis.

We turn to the Defendant's challenge to the sufficiency of the evidence to support his convictions, which relies on his self-defense theory. He argues that the State failed to disprove his self-defense theory.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *Hanson*, 279 S.W.3d at 275).

Second degree murder is an unlawful and knowing killing of another. T.C.A. § 39-13-210(a)(1) (2018). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b) (2018).

Viewed in the light most favorable to the State, the evidence showed that the Defendant raised a gun and fired it repeatedly at the victim, who was not shown by the proof to have displayed a weapon or to have engaged in any other threatening conduct.

Firing multiple shots at a victim from chest height at relatively close range is conduct which a person would know was reasonably certain to cause the victim's death. *See id.* The evidence failed to show any actions by the victim which might create a reasonable belief of imminent danger of death or serious bodily injury in a person who was in the Defendant's position. In these circumstances, a rational jury could conclude that the Defendant's actions were an unlawful, knowing killing of the victim and that the Defendant knew this conduct was reasonably certain to cause the victim's death. The evidence is sufficient to support the second degree murder conviction.

The Defendant was also convicted of unlawfully possessing a firearm after having "been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon." *Id*. § 39-17-1307(b)(1)(A) (2018) (subsequently amended). Consistent with his stipulation at the trial, the Defendant acknowledges his qualifying prior felony conviction, but he argues that the State failed to prove he possessed a firearm. He claims that the "surveillance footage didn't clearly show him with a firearm." He also argues that no firearm was recovered from him and that no forensic evidence linked him to a weapon. Despite the Defendant's protestations, the video evidence, when viewed in the light most favorable to the State, supports a conclusion that the Defendant unlawfully possessed a firearm. The video evidence depicted the Defendant arriving at the motel with Mr. Davis days earlier. The video evidence for the date of the crimes showed the Defendant raising his arms with an object in his hands, pointing it at the victim, and muzzle flashes coming from the object. The victim raised his arms to shield himself and ran. The victim died from a gunshot wound, which entered his arm, traveled to his chest, and pierced his aorta. A bullet was recovered from his body. A rational jury could conclude from this evidence that the Defendant unlawfully possessed a firearm. The evidence is sufficient to support the Defendant's unlawful firearm possession conviction.

Although not raised by the parties, we note a clerical error on the judgment for Count 2, the firearm conviction. The judgment reflects an incorrect statutory citation for the conviction offense. The case must be remanded to the trial court for correction of the clerical error. The judgment for Count 2 shall be corrected to reflect that the Defendant was convicted of a violation of Code section 39-17-1307.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed. The case is remanded for correction of the judgment in Count 2.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE